UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PENTON MEDIA, INC., | ) | Case No.: 1:03 CV 2111 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| AFFILIATED FM INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant | ) | ORDER |

On September 30, 2005, this court denied Plaintiff Penton Media, Inc.'s ("Plaintiff" or "Penton") Motion for Partial Summary Judgment, and granted Defendant Affiliated FM Insurance Company's ("Defendant" or "Affiliated FM") Motion for Summary Judgment. (ECF No. 52.) Now pending before the court is Penton's Motion for Reconsideration. (ECF No. 55.) For the reasons stated below, the Motion is denied.

## I. FACTS AND PROCEDURAL HISTORY[1]

Penton postponed its Internet World Fall 2001 Conference (the "IW Conference"), scheduled for October 1-5, 2001, at the Jacob K. Javits Convention Center ("Javits Center") in New York City, due to the events of September 11, 2001. Penton contends that its losses from the

---

[1] A full summary of the pertinent facts is available in the court's September 30, 2005 Order, ECF No. 52.

postponement of the IW Conference were covered under its insurance policy with Affiliated FM; in its prior Order, the court held that the insurance policy did not cover Penton's losses.

## A. Insurance Policy

The Declarations section of Penton's policy with Affiliated FM provides insurance for:

> All risks, as defined and limited herein, on Personal Property, Extra Expense, Gross Earnings including Ordinary Payroll for 30 days, and including Extensions of Coverage applying at the following locations:
>
> <u>Location Schedule:</u>
>
> 1. 1300 E. Ninth St., Cleveland, OH 44114, Index No. 49257.12
> 2. 100 Shoreline Hwy., Suite 201-A, Mill Valley, CA
> 3. 1350 Connecticut Ave, NW, Suite 902, Washington, DC . . .

(Policy, Pl. Mot. for Summ. J. Ex. 9, FM-C 00380, ECF No. 40.) The "Location Schedule" goes on to list thirty-one locations (together, the "Penton Locations"). The Javits Center is *not* included in the list of Penton Locations.

The policy also contains a set of Business Interruption Endorsements ("BIE"), which reimburse Penton for certain expenses due to specifically-defined business interruptions. The BIE reimbursing Penton for "Extra Expense" due to business interruptions states:

> Business Interruption Endorsement
> Extra Expense Endorsement
>
> 1. Coverage Provided:
>
> In consideration of additional premium, this policy is extended to cover at locations described in the declarations:
>
> > A. The actual loss of Extra Expense sustained by the Insured:
> >
> > > 1) Resulting from direct Physical loss or damage from perils insured by this policy; and
> > >
> > > 2) To insured property utilized by the Insured.

(*Id.* at FM-C 00407.)

The Extra Expense BIE also contains additional coverage when access is blocked due to an order of civil authority:

> 5. Additional Coverages:
>
> > A. Civil Authority:
> >
> > Coverage is provided when access to the described location is prohibited by order of civil authority. This order must be given as a direct result of physical loss or damage from a peril of the type insured by this policy. The company will be liable for the actual amount of loss sustained at such location for a period of up to 30 consecutive days from the date of this action.

(*Id.* at FM-C 00409.)

A central dispute in this case is whether the BIE, and specifically, the Civil Authority provision of the BIE, applies to the Javits Center. Although the Javits Center is not on the list of thirty-one Penton Locations, it is clear that the contract provides at least *some* coverage to Penton supplier and customer locations such as the Javits Center, as discussed in the Declarations:

> 1. <u>Contingent Business Interruption Coverage</u>
>
> The Business Interruption Endorsement, [Gross Earnings including Ordinary Payroll, Extra Expense] attached to this policy is extended to cover the actual loss sustained by the Insured directly resulting from direct physical loss or damage insured by this policy occurring at each supplier and customer location(s) list below:
>
> | <u>Location</u> | <u>Name and location of supplier or customer</u> | <u>L i m i t   o f Liability</u> |
> |---|---|---|
> | 1 | Coverage is provided for supplier and customer locations situated in: the fifty (50) United States; Commonwealth of Puerto Rico; Virgin Islands; and Canada | $5,000,000 |

(Pl. Mot. for Part. Summ. J. Ex. 9 at FM-C 00383, ECF No. 40.) Thus, the dispute is the extent to which the above Declaration extends or limits Business Interruption Endorsement coverage for supplier and customer locations.

### B. Court's September 30, 2005 Order

The court granted summary judgment in Affiliated FM's favor, holding that the above policy did not cover Penton's losses from postponing the Internet World conference. In its Order, the court held that the Civil Authority provision of the BIE applied to only the thirty-one Penton Locations listed in the location schedule, but not to the Javits Center or any of the supplier and customer locations. Additionally, the court ruled that even if the Civil Authority provision of the BIE applied, there was no order of civil authority which would have triggered coverage.

### II. RECONSIDERATION STANDARD

The court notes that it has the authority to reconsider its Order. Motions to reconsider may be treated as motions to alter/amend judgment under Fed. R. Civ. P. 59(e). *Huff v. Metro. Life Ins. Co.,* 675 F.2d 119, 122 (6th Cir. 1982). Rule 59(e) motions may be granted if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) to prevent manifest injustice. *E.g., Gencorp, Inc. v. American Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir. 1999).

Though it has authority to do so, a court will only reconsider its prior ruling in rare and unusual circumstances:

> Although 'motions to reconsider are not ill-founded step-children of the federal court's procedural arsenal,' they are 'extraordinary in nature and, because they run contrary to notions of finality and repose, should be discouraged.' *In re August,* 1993 Regular Grand Jury, 854 F. Supp. 1403, 1406 (S.D. Ind. 1994). To be sure, 'a court can always take a second look at a prior decision; but 'it need not and should not

-4-

> do so in the vast majority of instances,' especially where such motions 'merely restyle or re-hash the initial issues.' *Id.* at 1407. It is not the function of a motion to reconsider either to renew arguments already considered and rejected by a court or 'to proffer a new legal theory or new evidence to support a prior argument when the legal theory or argument could, with due diligence, have been discovered and offered during the initial consideration of the issue.' *Id.* at 1408. Where, as is the case with much of the instant motion, 'defendant views the law in a light contrary to that of this Court,' its 'proper recourse' is not by way of a motion for reconsideration 'but appeal to the Sixth Circuit.' *Dana Corp. v. United States,* 764 F. Supp. 482, 489 (N.D. Ohio 1991).

*McConocha v. Blue Cross and Blue Shield Mut. of Ohio*, 930 F. Supp. 1182, 1184 (N.D. Ohio 1996).

Motions to reconsider are "not designed to give an unhappy litigant an opportunity to relitigate matters already decided, nor is it a substitute for an appeal." *Sherwood v. Royal Ins. Co. of Am.,* 290 F. Supp. 2d 856, 858 (N.D. Ohio 2003).

## III. LAW AND ANALYSIS

Penton's motion for reconsideration argues that the court made clear legal errors and must correct them in order to avoid a manifest injustice. The court notes that Penton raises few, if any, new arguments that it did not previously raise in the summary judgment briefing. Penton contends that genuine issues of material fact remain as to whether: (1) the Civil Authority provision applies to supplier and customer locations such as the Javits Center; and (2) an order of civil authority existed. For the reasons stated below, the court disagrees.

### A. Application of Civil Authority Provision to Javits Center

In its Order, the court held that the Civil Authority declaration in the BIE did not apply to supplier and customer locations such as the Javits Center. Penton raises three arguments against the court's ruling: (1) correspondence between Affiliated FM employees shows an intent to cover trade shows with civil authority coverage; (2) changes to Affiliated FM's policies show the 'described

-5-

location' language was ambiguous; and (3) civil authority coverage applies to any location where Penton has an insurable interest.

**1. Affiliated FM Correspondence**

Penton first argues that the court overlooked a genuine issue of material fact regarding whether FM's underwriters intended to extend civil authority coverage to supplier and customer locations such as the Javits Center. In support, it cites two e-mails and a deposition transcript. The first document, an email between FM underwriters, reads:

> Coverage would be for the business interruption suffered as a result of a covered peril at any trade show location. Attached is the wording we use for the U.S. and Canada:
>
> The Business Interruption Endorsement, [Gross Earnings including Ordinary Payroll, Extra Expense] attached to this policy is extended to cover the actual loss sustained by the Insured directly resulting from direct physical loss or damage insured by this policy occurring at each supplier and customer location(s) list below:
>
> <u>Location</u>   <u>Name and location of supplier or customer</u>   <u>Limit of Liability</u>
>   1       Trade shows usual to the insured's operations    $5,000,000

(Feb. 16, 2001 e-mail, ECF No. 40, Ex. 4.)

The court first notes that for the reasons discussed in its prior Order and clarified in this Order, the contract is not ambiguous. Inasmuch as it is improper to consider extrinsic evidence in analyzing an unambiguous contract, the court finds Penton's argument not well-taken.

Even if the court were to consider the above e-mails, the above message does not mention or reference civil authority coverage at all. The e-mail confirms that trade show locations, such as the Javits Center, would be covered if there was a direct physical loss at the location, under the CBI declaration's explicit terms. The second e-mail also does not mention civil authority coverage.

(Feb. 19, 2001 e-mail, ECF No. 40, Ex. 29.) Furthermore, the deposition testimony does not indicate Affiliated FM believed the Civil Authority provision covered trade shows. Each document references the CBI declaration, which does not contain any explicit civil authority coverage. The court had these documents before it when it issued its first Order, and did not discuss them directly because they provided no evidence of Affiliated FM's intent to extend civil authority coverage to supplier and customer locations. These documents do not create a genuine issue of material fact, and do not present a clear error of law.

## 2. Changes to Affliated FM's Policies

In its summary judgment briefing, Penton argued that subsequent changes to Affiliated FM's policy language constituted an admission that the previous language was ambiguous. In its Order granting Affiliated FM's motion for summary judgment, this court held:

> The argument that Affiliated FM has changed the language in its new policies to more clearly specify which locations are described locations does nothing to change this analysis. There is no evidence such alternative clarifying language was in use at the time the Penton Policy was written and signed. The mere fact that Affiliated FM decided to clarify future policies when faced with a lawsuit is not proof that the previous language meant what Penton asserts it does, or is even ambiguous.

(Sept. 30, 2005 Order at 17, ECF No. 52.) Penton now contends that it does have evidence that the alternative clarifying language existed at the time Defendant wrote Penton's policy, and cites a policy issued by Defendant's parent company, FM Global, which provides:

> This policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business <u>due to prevention of ingress to or egress from an Insured Location,</u> whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

(Pls. Opp. Br., Ex. 34 at FM-U 00074, ECF No. 45.)

-7-

The court again notes that inasmuch as the contract is unambiguous, it would be improper to consider extrinsic evidence of different language used in different insurance agreements. However, were the court to consider Penton's argument on this point, the court would also find it not well-taken. The above policy is not from Affiliated FM, but from its parent company, and is not proof that Affiliated FM was aware of alternative language. Even if Affiliated FM knew about this language, the provision's existence provision shows Affiliated FM knew how to craft language which *would cover* supplier and customer locations such as the Javits Center, but chose not to do so in the instant case. This is not evidence of Affiliated FM's "intentional use of an ambiguous term." (Pls. Mot. for Recons. 7, ECF No. 55.) Penton has not demonstrated how alternative clarifying contract language renders this court's ruling a clear error.

### 3. Civil Authority Coverage Applies Broadly

Penton's final contention in this area essentially rehashes arguments Penton previously made, and this court previously rejected, in the summary judgment briefing. Penton contends that the Civil Authority coverage applies not just to the 31 specifically listed locations, but also to all supplier and customer locations. Penton alleges that "[t]he Court's analysis of the relationship between the CBI and the Civil Authority provision assumes that the only coverage for losses at customer and supplier locations is that provided in the CBI." (Mot. for Reconsid. 5, ECF No. 55.) The court did not *assume* this fact; rather, it was the ultimate conclusion of the court's analysis.

The court's analysis in its prior Order may be summarized as follows:

1. The Affiliated FM policy was an all-risk policy covering thirty-one specific Penton Locations, as spelled out in Section D of the Declarations.

-8-

2. The Business Interruption Endorsements[2] provide coverage for "[t]he actual loss of Extra Expense sustained by the Insured: 1) Resulting from direct Physical loss or damage from perils insured by this policy; and 2) To insured property utilized by the Insured." (Policy, Pl. Mot. for Summ. J. Ex. 9, FM-C 00407, ECF No. 40.) The Business Interruption Endorsements also provide coverage when "access to the described location is prohibited by order of civil authority." The parties agree that the Business Interruption Endorsements apply *in their entirety* to *at least* the thirty-one Penton Locations.

3. The next issue is whether these endorsements apply to the Javits Center. Penton argues that the Business Interruption Endorsements apply to *both* the thirty-one Penton Locations *and* to all supplier and customer locations in the United States. The relevant provision is Section H of the Declarations which states: "[t]he Business Interruption Endorsement is extended to cover the actual loss sustained by the Insured directly resulting from direct physical loss or damage assured by the policy at each supplier and customer location lists (sic) below: . . . Supplier and customer locations situated in the 50 United States." (*Id.* at FM-C 00383.)

4. The above-mentioned Declaration *does* extend coverage to customer and supplier locations, including the Javits Center, for losses to the Insured *directly resulting* from the physical loss or damage; however, that is not the nature of the claim here. The Javits Center was not damaged or destroyed as a result of the September 11, 2001

---

[2] As discussed, there are Business Interruption Endorsements for "extra expense" as well as for "gross earning including ordinary payroll for 30 days."

>   terrorist attacks.  The real issue is whether the Business Interruption Endorsement, including the civil authority provision, applies in its entirety to supplier and customer locations such as the Javits Center.
>
> 5. The answer from a reading of the contract is no.  While Section H of the Declarations extends the Business Interruption Endorsement to all customer and supplier locations in the United States, it only does so to the extent of "the actual loss sustained by the Insured directly resulting from direct physical loss or damage insured by this policy at each supplier and customer(s) location lists (sic) below. . . ."  It does not indicate that the Business Interruption Endorsement covers losses at those supplier and customer locations where "access to the described location is prohibited by order of civil authority."

(*See* Sept. 30, 2005 Order at 15-16, ECF No. 52.)

If the parties intended to fully extend the BIE to all customer and supplier locations, the language "resulting from direct physical loss or damage insured by this policy" would be surplusage; the policy could have contained basic language extending all business interruption coverage to supplier and customer locations, with a $5,000,000 limit.  The civil authority coverage is listed under the BIE in the policy, and is thus part of the BIE.  The supplier and customer locations are not listed with the 31 specific locations where insurance is provided, but are *solely* listed in the CBI declaration.  Thus, upon reading the contract as a whole, when the Civil Authority BIE references 'described locations,' it could not intend to include supplier and customer locations such that they get identical coverage to the thirty-one specifically-listed locations.

To the extent it was unclear from the court's prior Order, the court now clarifies that it never

found the policy to be ambiguous.  In fact, it found to the contrary.  The court did hold that 'described location' was not a defined term, and implied that the term could be ambiguous if read in a vacuum absent the remainder of the policy.  The court then performed two analyses.  First, the court read the policy in its entirety to ascertain the parties' intent, and found the policy unambiguously excluded supplier and customer locations from civil authority coverage.  *See Burris v. Grange Mut. Cos.,* 545 N.E.2d 83, 89 (Ohio 1989).  This was consistent with Ohio precedent requiring that undefined words in an insurance contract should be read according to their ordinary meaning, "unless another meaning is clearly apparent from the contents of the policy." *Stadium Lincoln-Mercury, Inc. v. Heritage Transport,* 160 Ohio App. 3d 128, 133 (Ohio Ct. App. 2005).  Second, the court also looked to the ordinary meaning of the undefined terms, and examined the case law on the ordinary meaning of civil authority insurance clauses.  This examination reinforced the court's conclusion that the parties did not intend to extend civil authority coverage to supplier and customer locations.

Additionally, the court clarifies that the extrinsic evidence of Penton's statements[3] was not the basis for its ruling. The court's ruling was without consideration of any extrinsic evidence. However, if the policy were ambiguous, Penton's statements would constitute powerful extrinsic evidence that there was no coverage for the Penton event scheduled for the Javits Center.

Penton renews its argument that the Civil Authority declaration should apply to any location at which it has an insurable interest. However, this runs counter to the plain language of the policy, which limited coverage to 'described locations' as discussed above. Since Penton has not cited any law, or made any argument, to call into question the above analysis, the motion for reconsideration is denied on this point.

### B. Order of Civil Authority

The court previously held that even if the Civil Authority declaration covered events at the Javits Center, Penton was not entitled to coverage for the events in question because no order of civil authority prohibited access to the Javits Center. An order is "a rule or regulation made by a competent authority." Webster's Third New International Dictionary (2002). In previously reaching

---

[3] Penton conceded that it read the CBI clause to provide an:

> extension of coverage to include contingent business interruption for trade shows usual to Insured's operation. The coverage, initially, extended to shows in the US. The limit is $5 million. During this policy year, the coverage was extended to include international shows with a limit of $1 million. Although these extensions were not as inclusive as specific event cancellation programs, they were added to our program at no additional cost. The trigger for a claim under these extensions would be a "covered event" at our show venue. Covered events would be, for example, fire, windstorm, etc., causing damage to the venue making our event cancel.

(Def. Mot. for Summ. J. Ex. W, ECF No. 39.)

the conclusion that no evidence in support of a finding that a civil authority existed in this case, the court stated:

> The word "order" is defined as "an authoritative indication to be obeyed." Webster's II New Riverside Univ. Dictionary (1994). Black's Law Dictionary defines "order" as "a mandate; precept; command or direction authoritatively given; rule or regulation." Black's Law Dictionary (6th Ed. 1990). These definitions contemplate something authoritative or mandated. In this case, however, there was no such authoritative command from a civil authority. Rather, there was a lease agreement between FEMA and the Javits Center. FEMA and the city of New York went to the Javits Center management and said, in effect, we need emergency use of your facilities; they did not, however, issue any formal order of civil authority. While the court does not dispute that the lease was entered into under threat of condemnation, the fact remains that many orders of civil authority were issued in the wake of 9/11, but there is no evidence in the record that any specific order of civil authority mentioned the Javits Center or ordered it closed. It is not clear whether FEMA and the New York Mayor's Office of Emergency Management would have issued an order of civil authority commandeering the Javits Center if the Javits Center management had refused to sign a lease, let alone whether they could have done so successfully. Aside from the lease, Plaintiff offers no evidence that the decisions by the Javits Center management to permit relief agencies to use the Javits Center were anything but voluntary. Thus, the court concludes that there was no order of civil authority.
>
> \* \* \*
>
> The court is not unsympathetic to Penton's situation, or to the post-9/11 environment in New York. Undoubtedly, Penton could not have moved into the Javits Center to hold its conference. However, this was not because of a[n] order of civil authority. It was because FEMA had leased the space, and the Javits Center has permitted other relief groups to use their facility. Thus, there was no coverage.

(Sept. 30, 2005 Order at 20-22, ECF No. 52.)

Penton argues it was clear error for the court to conclude there was no order of civil authority. It contends the court overlooked a genuine issue of material fact: whether a lease entered into under threat of condemnation is an order of civil authority. Penton also argues the court's

-13-

interpretation of the term 'order' imposed three extra-contractual requirements on it as an insured: (1) that the order must be sufficiently formal; (2) that the order must be directed to the insured by name; and (3) that the order must mention by name the location where access is prohibited. (Pl. Reply Br. in Supp. of Mot. For Recons. at 4, ECF No. 57.)  For the reasons stated below, the court disagrees.

First, the court notes that although 'order' is undefined in the contract, this does not render the term or the policy ambiguous. *See, e.g., Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999).  Indeed, the court did not find the term 'order' ambiguous.  Thus, whether the Penton-FEMA lease was an order of civil authority is not a question of fact, but a question of law.  Affiliated FM does not dispute that the lease existed; indeed, there are no factual disputes regarding the lease for a fact finder to determine.  The sole dispute is whether the lease is an order under the unambiguous, legal meaning of the term 'order' in the policy.  The parties briefed and argued this issue extensively at summary judgment.  The court previously held that a lease is a voluntary agreement, not an order.  To hold otherwise would make any action taken under any threat of government action an order of civil authority.  Penton has offered no additional case law or persuasive arguments to convince the court its decision was in error.

Penton also contends that the court has read additional requirements into its insurance policy. Penton misreads the court's order.  The court *did not* hold that an order of civil authority must be sufficiently formal, or mention by name the location where access was prohibited.  Rather, the court held that an order must be an order - not a lease as in this case.  In evaluating whether or not there was an order, the court considered the formality and specificity of the alleged order as non-

-14-

exhaustive and non-dispositive factors. However, the court did not hold that an order must be formalized in writing, or be specific to any party.

Penton cites several cases for the proposition that "orders that were neither directed to the insured by name nor specific as to any particular place of business" were orders of civil authority. (Pl. Reply Br. in Supp. of Mot. For Recons. at 5, ECF No. 57.) However, these cases are inapposite and unpersuasive. In *Zurich American Insurance Co. v. ABM Industries, Inc.,* 397 F.3d 158, 161, 171 (2d Cir. 2005), the policy covered an "order or action" of civil authority, not simply an order. Likewise, the policy in *Abner, Herman & Brock v. Great Northern Ins. Co.,* 308 F.Supp. 2d 331, 335 (S.D.N.Y. 2004) provides coverage "when a civil authority prohibits access" and does not refer to an order at all. These cases are not helpful in evaluating whether something was or was not an *order* of civil authority.

Likewise, the trio of Michigan Court of Appeals cases cited by Penton are factually distinguishable. *See Sloan v. Phoenix of Hartford Ins. Co.,* 207 N.W.2d 434, 437 (Mich. Ct. App. 1973); *Allen Park Theatre Co., Inc. v. Michigan Millers Mutual Ins. Co.*, 210 N.W.2d 402 (Mich Ct. App. 1973); *Southlanes Bowl, Inc. v. Lumbermen's Mutual Ins. Co.,* 208 N.W.2d 569, 570 (Mich. Ct. App. 1973). In those cases, the government issued formal curfew orders closing all places of amusement, and the courts found these to be orders of civil authority for purposes of insurance coverage. In the instant case, however, there is no evidence in the record of the Governor or President or other civil authority issuing a curfew order of the type issued in *Sloan, Allen Park Theatre Co.,* or *Southlanes Bowl, Inc.,* closing all places of business in the vicinity of the Javits Center. Accordingly, these cases do not persuade the court that its prior decision was clearly erroneous.

The court has neither read extra-contractual requirements into the insurance policy nor ignored genuine issues of material fact. The policy unambiguously requires an order of civil authority. An order could be oral or written. It could be formal or informal, as long as it comes from a civil authority. It could mention the Javits Center by name, or it could not, so long as the scope of the order clearly encompassed the Javits Center. However, the policy does not provide that a voluntary (or involuntary) lease agreement is an order of civil authority. It also does not indicate, or imply, that activities taken out of concern that the government might act is sufficient. This case is distinguishable from other cases wherein the policy at issue provided for coverage on a lesser showing, such as regarding "actions of civil authority."

### C. Agency Admissions

Penton's motion also asks the court to clarify its ruling regarding agency admissions. Penton submitted a statement from its insurance broker, Joseph Eardley, who asserts that he now believes the policy covers Penton's losses. The court's September 30, 2005 Order stated:

> Penton contends that Eardley was an agent of Affiliated FM, and his statement is binding on Affiliated FM. Under Ohio law, once an insurance broker "notifies its customer that he or she intends to place the customer's insurance coverage with a particular insurer" or "accepts an application for insurance on behalf of the customer," the broker becomes the agent of the insurer. *Damons Missouri, Inc. v. Davis*, 63 Ohio St. 3d 605, 612 (Ohio 1992). Even if Eardley was Penton's agent at the time the Policy was negotiated, he was an agent for that time and purpose only. There is no evidence he was an agent for anything other than that purpose, at that time. The law does not support holding Penton responsible for Eardley's interpretations of the Policy, five years after the fact, particularly when there is no evidence Eardley interpreted the Policy in such a way or made any representations about this type of coverage when the Policy was sold and negotiated. To the contrary, Eardley's testimony indicates that it was not immediately clear to him that Penton was covered under the Policy. Eardley's testimony does not call into question the court's finding that the Javits Center was not a described location and that no order of civil authority was issued.

(Sept. 30, 2005 Order at 22-23, ECF No. 52.) Penton points out that the court mistakenly stated that Eardley was *Penton's* agent at the time the policy was negotiated, not Affiliated FM's agent. Penton is correct. The court clarifies that it intended to hold that "even if Eardley was *Affiliated FM's* agent at the time the policy was negotiated, he was an agent for that time and purpose only." This correction does not change the disposition of the case in any substantive way.

### D. Liquidated Damages

Penton also addresses the issue of whether it paid liquidated damages. However, the court never concluded that Penton paid liquidated damages, nor did the court rely on this issue in making its determination. Accordingly, the issue is moot and there is nothing for the court to reconsider.

### IV. CONCLUSION

For the reasons stated above, Penton's Motion for Reconsideration (ECF No. 55) is denied. The court affirms herein its original conclusion in granting summary judgment for Defendant Affiliated FM, that the insurance contract provisions at issue in the Penton policy are not ambiguous. To the extent the court's prior opinion could be read to rely on matters extrinsic to the contract, the court clarifies herein that this was not its intent. Furthermore, on full reconsideration of the motion for summary judgment, the court has considered no extrinsic matters, and its decision rests entirely on a reading of the unambiguous contract provisions. After so doing, the court concludes that its prior summary judgment Order was correctly decided. The civil authority provision of the BIE does not apply to supplier and customer locations such as the Javits Center, and even if it did, there was no order of civil authority in this case.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.

UNITED STATES DISTRICT JUDGE

August 28, 2006